IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MICHAEL WILLIAM EBERLY, etc.,

                Plaintiff,              Case No. 3:06 CV 1487

    -vs-

                                      MEMORANDUM OPINION

OPTIMUM NUTRITION, INC., et al.,

                Defendant.

KATZ, J.

This matter is before the Court on motions for summary judgment by the defendants (Doc. 96, 100) and the plaintiff (Doc. 108). This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I. Background**

On December 5, 1994, Michael William Eberly d/b/a American Body Builders, Inc. a/k/a American Body Building Products of Ohio ("Plaintiff") entered into a distribution agreement with Defendant American Body Building Products, Inc. (sometimes referred to as American Body Building) ("ABBP"), which was owned by James Horn. The parties signed the distribution agreement (or "Horn agreement") seeking to make Plaintiff the exclusive distributor in Ohio for ABBP's products. The Horn agreement granted an exclusive local source distributorship of ABBP products in Ohio to Plaintiff for an indefinite term. Section 3.2 of the Horn agreement provided that Plaintiff would be the sole "local source" of ABB products, but that the supplier (Defendant Optimum) "does and must sell national chain stores and multi-state specialty distributors." Horn Agreement at § 3.2.

Section 2 provided that either party could terminate the contract for cause and with specific notice procedures:

> The party alleging a breach of this Agreement shall notify the breaching party, in writing, which notice shall 1) specify the breach 2) provide for a (10) day period during which such breaching party may cure any such breach. In the event that after the expiration of ten (10) days, the breach is not cured, then and in that event, the party alleging breach shall again notify the breaching party, in a notice, specifying 1) the breach and 2) provide for a twenty (20) day period during which the breaching party may cure such breach. In the even that after the notices provided herein, the breaching party shall not effect a cure, then and in that event, this Agreement shall be terminated, provided that the party alleging the breach shall provide a final notice of termination which notice shall be effective immediately.

Horn Agreement at § 2.

The contract also included a standard merger clause. Section 15 of the Horn agreement provided that: "This agreement shall be binding upon and inure to the benefit of personal & legal representatives, successors and assignees of the parties hereto and also upon the heirs, executors and administrators of the individual persons acting as guarantors under the terms of this agreement." *Id.* at § 2.

The following year, Horn sold ABBP to Weider Nutrition Group, Inc., later known as Schiff Nutrition Group. In 2002, Schiff sold all its rights and interests in ABBP to Defendant Optimum Nutrition, Inc. Today, Optimum is a leading manufacturer of nutritional supplements, including nutritional bars, protein powders, sports beverages, vitamins, minerals, and herbs.

The parties also had dealings in Indiana. In December 1999, Plaintiff contends that Weider approached Plaintiff regarding taking over its distributor in Indiana, then owned by Dave Rogers, who owed Weider approximately $50,000.00 in past due accounts payable. Plaintiff agreed and paid off Rogers' debt and took on distribution of ABBP products in Indiana in addition to Ohio. Defendants Optimum and ABBP argue that the alleged deal was not reduced to writing and did not involve exclusive rights to Indiana.

On July 26, 2002, Defendants entered into an Asset Purchase Agreement ("APA") with Weider. Defendants acquired certain Purchased Assets and Assumed Liabilities in the sale, including selected contracts relating to the distribution of Weider's products. The APA defined Purchased Assets as "all assets and property and associated rights and interests, real, personal, mixed, tangible and intangible of whatever kind, owned or used by Seller [Weider] exclusively in connection with the Business, but excluding Excluded Assets." APA at Art. I. It also included Assumed Contracts, which the APA defined as "all (I) Contracts pursuant to which any third party purchases the Products from the Seller, . . . (iii) Contracts relating to the distribution of the Products[, and] (iv) Contracts involving any royalty, licensing or similar arrangement involving the Products . . . ." *Id.* Assumed Liabilities included "(g) all Liabilities under the Assumed Contracts to the extent arising out of or relating to events or conditions occurring after the Closing." *Id.*

Defendants argue that Plaintiff's Ohio and Indiana deals were not among those contracts acquired pursuant to the APA. An April 2, 2002 memorandum from Weider to all authorized ABBP distributors stated that Weider had previously terminated all of the original distribution agreements (or "Horn agreements"). Ex. D ("In recognition that many of you were selling more than ABB Products, Weider terminated the old Horn distribution agreements and most of you have been operating without an agreement since then."). A June 7, 2002 letter from Weider to ABBP stated that "Generally, all written contracts with distributors have been terminated." Ex. B. A June 17, 2002 schedule listed the only three remaining distribution agreements, which list did not include Plaintiff's. Ex. C.

In 2005, Europa, a multi-state, national ABBP distributor, expanded into Ohio with plans to distribute ABBP products in Cleveland, Columbus, Pittsburgh, Detroit, Lansing, Chicago, and Buffalo. Plaintiff alleges that Europa heavily discounted ABBP products, forcing Plaintiff out of the Ohio market and into liquidation. Plaintiff filed this lawsuit on June 16, 2006.

## II. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©. The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.

4

*Celotex*, 477 U.S. at 324; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. Discussion**

The Court herein must consider whether the defendants were bound by and breached the Horn agreement and the Indiana agreement, and if so, whether the plaintiff waived its rights under the agreements. The Court herein finds not only the lack of a material breach, but also that Plaintiff waived his rights to exclusive distribution under Florida law.

**A. Choice of law**

The Horn distribution agreement contains a choice of law provision that specifies that it "shall be governed by and construed in accordance with" Florida law. Horn Agreement at 10, § 23. *See Schulke Radio Prod., Ltd. v. Midwestern Broad. Co.*, 6 Ohio St. 3d 436, 438 (Ohio 1983) ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement" unless the state chosen by the parties "has no substantial relationship to the parties or the transaction and there is no reasonable basis" for the parties' choice.), *citing* Restatement (Second) of Law § 187 (1971). The parties agree that Florida law should apply to all the issues in this case, and they have not briefed the issue of whether any other state's law should apply to any part of this case.[1] The Court herein applies Florida law in its analysis of the Horn agreement.

**B. The Horn agreement for exclusive distributor rights in Ohio**

With regard to exclusive distribution in Ohio, this Court finds that, although the Horn agreement was not properly terminated by Weider or Defendants, Plaintiff acquiesced in the improper termination by operation of Florida waiver law. Even if Plaintiff had not waived his rights under the contract, he has shown no material breach of section 3.2 of the contract.

---

[1] *But cf. Norfolk Southern Ry. Co. v. Jacobs*, --- F. Supp.2d ----, 2008 WL 1932576 (N.D. Ohio 2008) (parties, in agreement, applied Ohio waiver law to contract with Pennsylvania choice of law provision). Here, the parties in agreement apply Florida waiver law.

6

### 1. No effective termination

Defendants argue that they were not bound by the Horn agreement based on the information provided by Weider upon the sale of ABBP to Optimum. Defendants claim that, because Plaintiff's distribution agreement was not included on the exclusive list provided by Weider, they cannot fairly be held to have assented to its acquisition.

The problem with this argument is that the Horn agreement with Plaintiffs was never properly terminated. Section 2 of the agreement provided for a specific notice and termination process, which the parties do not dispute was never followed. When Defendant Optimum acquired Weider's business via Optimum's subsidiary ABBP, the APA provided that any contracts and agreements, including by definition the Horn agreement, were part of the acquisition. Someone, and not Plaintiffs, did not properly terminate the agreement. When Defendants acquired Weider's interests, assets, liabilities, contracts, and business, they also acquired Weider's lack of proper termination of the Horn agreement. That the schedule of agreements provided by Weider to Optimum did not include Plaintiff's Horn agreement certainly does not cure, negate, or absolve anyone of responsibility for not terminating the agreement pursuant to section 2 of the Horn agreement. Further, by no means can Weider's previous declarations that the agreements were terminated alone constitute effective termination of the contracts, including Plaintiff's.[2] Courts generally enforce a contract's termination procedures

---

[2]

There are other contexts where, as in this case, "declaring" a legal relationship to be terminated, alone, is not legally effective. *See, e.g., The Office: Episode 4.4 "Money"* (NBC television broadcast Oct. 19, 2007) (wherein Michael Scott (Steve Carell), in an attempt to cure his personal financial woes, attempts to declare bankruptcy by stepping out of his office and yelling "I declare bankruptcy!"; later, accountant Oscar Martinez (Oscar Nunez) advises him that more is required to give the "declaration" legal effect).

where they are reasonable and unambiguous. *See American Speedy Printing Centers, Inc. v. AM Marketing, Inc.*, 69 Fed.Appx. 692, 701 (6th Cir. 2003); *Off The Grill Franchising, LLC v. Hickory Partners, LLC*, 2006 WL 1454744, at *5 (M.D. Tenn. May 24, 2006); *Matthews v. George Weston Bakeries*, 2007 WL 2952155, at *4 (E.D. Mich. Oct. 9, 2007). Plaintiff further indicates in his reply brief that Defendants did follow the termination procedures with regard to certain other distributors subject to Horn agreements in California. The Court agrees that Section 2 of the exclusive distribution agreement provides a specific process for notice of termination, and because it was not followed, the contract was not properly terminated. However, the analysis does not stop there.

### 2. Effective waiver under Florida law

The subsequent question is whether Plaintiff acquiesced in that method of termination to the extent that he waived his rights under the Horn agreement to be the exclusive distributor of ABB products in Ohio. Importantly, the "no waiver" provision of the Horn agreement itself contemplated waiver but did not provide a method for or prohibition on waiver. It states, in full:

> The waiver of a breach of any term or condition of this Agreement shall not be deemed to constitute the waiver of any further breach of such term or condition or the waiver of any other term or condition of this Agreement. Nothing contained in this Agreement shall be construed as prohibiting Supplier or Distributor from pursuing any other remedies available to it for any breach or threatened breach, including the recovery of money damages.

Horn Agreement at § 20. This language does not amount to an "anti-waiver clause," as Plaintiff suggests. Pl.'s Br., Doc. 121 at 6. The clause does not provide that waiver shall not occur, or prescribe a specific and exclusive means or process by which rights may be waived. Rather, it provides that if and when waiver of some provision occurs, it should not be considered a total waiver of the entire agreement. For the reasons discussed herein, the Court finds that Plaintiff

waived his rights under the termination and exclusive distributor portions of the contract by acquiescing in the defendants' announced (albeit non-compliant) repudiation of the termination and exclusive distribution terms. That acquiescence, as waiver, is not defined by the contract, but by Florida law.

Under Florida law (which both parties use to analyze this issue in their briefs), a party may waive contractual rights through subsequent inconsistent conduct. *Abrogast v. Bryan*, 393 So.2d 606, 608 (Fla. App. 1981). In Florida, "[w]aiver is the intentional [or voluntary] relinquishment of a known right, . . . or conduct which warrants an inference of the relinquishment of a known right. It may be express or implied; and when a party waives a right under a contract he cannot, without the consent of his adversary, reclaim it. . . ." *Id.* at 607-08 (*citing* 22 Fla. Jur. 2d, Estoppel & Waiver, §§ 86-97). Waiver requires "[t]he existence at the time of the waiver of a right, privilege, advantage or benefit which may be waived; the actual or constructive knowledge thereof; and an intention to relinquish such right, privilege, advantage, or benefit." *Id.* "Waiver may be express or implied. Although waiver does not arise from forbearance for a reasonable time, it may be inferred from conduct or acts putting one off his guard and leading him to believe that a right has been waived. . . ." *Id. See also Insurdata Marketing Services, LLC v. Healthplan Services, Inc.*, 352 F. Supp.2d 1252, 1258 n.5 (M.D. Fla. 2005).

Here, over the course of several years, Plaintiff did not object to explicit indications from Defendants to the effect that he did not have an exclusive distributorship any longer. After the APA was executed, Optimum's president, Michael Costello, issued a memorandum dated November 19, 2002 to all ABB product distributors, including Plaintiff, concerning distribution policies. The memo pointed out that prior Horn agreements had been dissolved, but that Optimum

9

would consider reinstating exclusive territories to distributors that meet certain criteria as "Priority 1" distributors.  Further, the memo indicated that where there were no Priority 1 distributors, the area was "fair game" to all distributors.  Costello Memo, Doc. 107, Ex. 7, Ex. A. Plaintiff went so far as to discuss Priority 1 exclusiveness with his vice president and sales manager, and decided against applying for it.  Plaintiff admitted at deposition that he was aware of the 2002 Costello memo and the policy against exclusive distributor contracts.  Eberly Depo. at 137, 152.

Two years later, on October 11, 2004, Defendants' sale representative, Bernie Hanchak, issued an email to various recipients, including Plaintiff, that said "There are no exclusive territories."  Eberly Depo. at 123-26.  Although Plaintiff received the email, he did not call, respond, or otherwise contact Defendants to indicate that he believed his Horn agreement still applied.

Under Florida law, Plaintiff's silence qualifies as effective waiver of his rights under the contract.  "We appreciate the fact that there is a well-recognized distinction between the doctrines of waiver and estoppel. Ordinarily, waiver must be supported by a valid consideration, but this is not true in a case such as this where there is also present conduct or silence which injects an estoppel into the factual picture limned by the record."  *Mark v. Hahn*, 177 So.2d 5, 8 (Fla. 1965).  In *Mark*, the Florida Supreme Court held that the respondent waived her rights under a property sale contract "because of the failure of the respondent, at the time she refused the proffered terms and demanded all cash, even to mention the fact, if it were a fact, that she was reserving the right to back out." *Id.*  Similarly, in the case before this Court, Plaintiff may have insisted on certain rights, but the complaints allegedly filed by Plaintiff were based on Optimum's "cooler" rule, which was embodied in Optimum's memos and policies, not merely in the Horn agreement.

10

Plaintiff has not produced evidence that his or his company's complaints were grounded in the continued applicability of exclusive distributorship agreement in light of the multiple denunciations of the exclusiveness by Defendants. Plaintiff failed to insist on his rights, and instead complied with the newly pronounced parameters of Optimum's policies (as put forth in the memo, email, and other communications), thereby effectively waiving his exclusive distribution rights under Florida law. *Id.* at 8-9 n.1 (citing *Rader v. Prather*, 100 Fla. 591, 597 (Fla. 1930) ("Waiver may be inferred from conduct or acts putting one off his guard and leading him to believe that a right has been waived.")).

### 3. No material breach of section 3.2

Even if the Horn agreement were applicable and not waived, the Court notes that there is no apparent material breach of the Horn agreement. Plaintiff admits that the vast majority of his complaint is based on Defendants' supplying of the national distributor Europa with products to distribute in Ohio and Indiana.

Section 3.2 of the Horn agreement commits to Plaintiff as the sole "local source" of ABB products, but explicitly notes that "The distributor [Plaintiff] understands that the supplier [Defendant Optimum] does and must sell national chain stores and multi-state specialty distributors." Horn Agreement at § 3.2. After Optimum obtained Weider's interests in the business, Defendants sent a press release out to several recipients, including Plaintiff, that "ABB's established nationwide direct service distribution (DSD) networks will remain intact to ensure prompt delivery and unmatched customer support. . . ." Press Release, Ex. 9. As noted above, Europa is a national chain supplier. Plaintiff disputes that Europa is a multi-state specialty distributor, but presents no evidentiary support for that point. Further, Plaintiff admits that Europa

11

distributes health and nutrition products in more than one state and on a nationwide basis, and so cannot also argue that Europa is not a national chain store. One deponent referred to Europa at one point as "the Wal-Mart of the sports nutrition industry." Reid Depo. at 66-67. As such, even if the Horn agreement was valid and was not waived by Plaintiff, Plaintiff cannot show a breach of section 3.2.

### C. The oral agreement for exclusive rights in Indiana

The Court is asked to decide whether a valid oral contract was formed with regard to exclusive rights for Plaintiffs in Indiana. Plaintiff claims that he purchased the previous Indiana distributor's debt in exchange for exclusive rights from Weider, and that Weider transferred that obligation to Defendants. Defendants argue that Plaintiff's claim is barred by the statute of frauds because it was never reduced to writing and involved goods over $500 and had an unlimited duration.

The Court, however, need not address whether a contract was effectively formed and what its terms were. Even if a contract was formed, it was terminated by Weider and Optimum in the method described above. In this instance, Plaintiff does not even have the benefit of the Horn agreement's termination provisions. When Weider and Optimum announced and communicated to Plaintiff, on multiple occasions, that exclusive distributorships were over, Plaintiff did not object, but rather complied. Any complaints he made were based on those communications and not on the terms of any specific agreement with regard to the Indiana territory.

### D. Florida trade practices law

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204, prohibits, and § 501.211 provides a remedy for, "[u]nfair methods of competition, unconscionable

12

acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Fla. Stat. § 501.204. The law allows any "person who has suffered a loss as a result of a violation of this part [to] recover actual damages, plus attorney's fees and court costs." Fla. Stat. § 501.211(B).

Even if this Court were to find that Florida statutory law applied to this dispute, Plaintiff's claims against Defendant under the FDUTPA are based on the same facts and allegations that underlie his contract claims. *See* Doc. 113 at 24. This Court has found that, although the exclusive distribution agreement was not terminated properly, Plaintiff acquiesced by silence and acting consistently with the termination for a long enough period of time that his rights were effectively waived. There is no basis for violation of the FDUTPA.

### E. Defendant ABBP's counterclaims

ABBP filed a counterclaim against Plaintiff alleging violation of the credit agreement and personal guarantee which both parties signed, and in which Plaintiff agreed to pay Defendant ABBP for products received. Plaintiff does not dispute that he signed these agreements, but nevertheless has not made such payments during the pendency of this litigation, in an apparent hold-out pending judgment and award by the Court on the other claims. The Court considers these issues distinct, and in any case rules in favor of Defendants (as described above) on the underlying issues. As such, summary judgment is granted in favor of Defendant ABBP, and Plaintiff is hereby ordered to fulfill his obligations under the purchase agreements for products acquired from Defendants.

**IV. Conclusion**

For the reasons discussed herein, Defendants' motions for summary judgment (Doc. 96, 100) are hereby granted. Plaintiff's motion for summary judgment (Doc. 108) is hereby denied.

IT IS SO ORDERED.

               s/ *David A. Katz*
              DAVID A. KATZ
              U. S. DISTRICT JUDGE